■ JAMES J. RODGERS, Respondent-Appellant, v LENOX HILL HOSPITAL, Appellant-Respondent. [674 NYS2d 670] —Order, Supreme Court, New York County (Paula Omansky, J.), entered on or about March 5, 1998, which, inter alia, denied defendant's motion for summary judgment dismissing the complaint and denied that part of plaintiff's cross motion for partial summary judgment dismissing the counterclaims, unanimously modified, on the law, to grant defendant's motion, and otherwise affirmed, without costs. The Clerk is directed to enter judgment in favor of defendant dismissing the complaint.

In the early evening hours of February 4, 1992, a paramedic unit consisting of Manfred Fuchs and Peter Halleck, employed by defendant, were dispatched to an apartment where they found a woman who was unconscious, but whom they erroneously declared to be dead. About 15 minutes after they left, the paramedics were summoned back to the apartment by two police officers who saw the woman move. Two other paramedics employed by defendant, Leonard Sadowsky and John Guerriero, the assistant supervisor, also responded to the second call; although the woman displayed signs of life, she expired shortly after reaching the emergency room. Guerriero falsely told the EMS dispatcher that the second call concerned a sick relative of the first patient, and Fuchs tore up the original log sheet

and ambulance call report and made new ones, to indicate that there had only been one visit, rather than two.

Between 7:00 and 7:30 that same night, plaintiff, defendant's EMS supervisor, first learned from Guerriero that in originally responding to a call, Fuchs and Halleck had erroneously proclaimed dead a woman who was only unconscious, and thereafter returned to the scene, and that Guerriero told the dispatcher he was unsure of the identity of the "second" patient. At plaintiff's invitation, Guerriero, Fuchs and Sadowsky joined him for cocktails at a local restaurant, where plaintiff learned around 10:30 P.M. that the woman had expired in the emergency room. Nevertheless, plaintiff made no effort to inquire into the details as to how the paramedics could have mistaken the patient as dead; nor did he request or review the log sheets or ambulance call reports, notify his superiors, or direct Guerriero to correct his account with the EMS dispatcher.

Around 3:00 A.M., another paramedic informed plaintiff that the police were contemplating filing an unusual occurrence report. However, plaintiff merely ascertained from the police that they had not filed such a report, though they apparently did so later, and told the paramedic to assemble the log sheets and ambulance call reports for his inspection in the morning. When the paramedic told plaintiff that he could not locate the pertinent documents, plaintiff spoke with Fuchs over the telephone, who, according to plaintiff's own contradictory accounts, either told him that he had destroyed the original records or that Guerriero had directed him to do so, but he did not. Nevertheless, plaintiff was content to wait until the morning before reviewing the new documents or otherwise investigating the incident itself or the cover-up attempt.

On his way to work, but while making a detour to pick up a "rack charger", plaintiff was summoned to a meeting by the senior administrators, who had learned of the incident through an inquiring news reporter. Plaintiff gave varying accounts as to the location and creation procedures for log sheets and ambulance call reports, and at first claimed to have learned of the incident only at 3:00 A.M. Based on plaintiff's failure to immediately apprise his superiors of the incident, his inadequate investigation, and his equivocal responses during the meeting, plaintiff's superiors decided he should be terminated, but waited to investigate the matter more fully.

Thereafter, plaintiff and the four paramedics were interviewed by two New York State Department of Health investigators. Plaintiff also secretly contacted MacNeil Cross, Chief of

Operations of the New York City EMS, and John Clair, Programs Director of the State Department of Health's Emergency Services. On April 6, 1992, plaintiff was terminated; subsequently, he commenced this action pursuant to Labor Law § 740, the "Whistleblowers' Statute."

Plaintiff did not tell the State investigators anything they did not also learn from the four paramedics, who were not terminated, and thus has failed to show that such testimony was a basis for his discharge. Plaintiff only speculates that someone might have overheard his telephone conversations with Clair, and he does not even disclose what the substance of those talks was. Likewise, while plaintiff postulates that someone might have espied him talking with Cross in a restaurant near the hospital, there is no evidence that plaintiff's superiors had any knowledge of the conversation. Defendant, on the other hand, has established its defense (see, Labor Law § 740 [4] [c]) that it had a valid reason for plaintiff's termination other than plaintiff's exercise of rights protected by Labor Law § 740 (see, DaSilva v Clarkson Arms, 189 AD2d 619), and the complaint should therefore be dismissed.

The affidavits of plaintiff and Dr. Michael Marin, his direct superior, conflict as to whether the two men had an "understanding" that plaintiff would be paid for holidays on which he did not work, and thus the court properly denied plaintiff's motion for partial summary judgment to dismiss the counterclaim for fraud in submitting false time sheets. We have considered plaintiff's other arguments concerning the counterclaim and find them to be without merit. Concur—Sullivan, J. P., Ellerin, Williams and Tom, JJ.